IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| MICHAEL HARRINGTON, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| V. | § | CIVIL ACTION NO.  4:20-cv-02633 |
| | § | |
| THE ART INSTITUTES INTERNATIONAL | § | |
| LLC, | § | |
| | § | |
| Defendant. | § | |

## PLAINTIFF'S ORIGINAL COMPLAINT

Plaintiff Michael Harrington ("Plaintiff") files this Original Complaint against The Art
Institutes International LLC ("Defendant").

## SUMMARY

1.      Plaintiff was employed by Defendant as Director of Enrollment.

2.      Plaintiff engaged in legally protected activity by opposing efforts by Defendant to
fraudulently draw Title IV funds from the federal government for students who never actually
enrolled in the school.

3.      Plaintiff was terminated by Defendant in retaliation for engaging in protected
activity and provided a pretextual reason for the decision.

4.      Plaintiff's termination violated the anti-retaliation provision of the False Claims
Act.

## THE PARTIES AND JURISDICTION

5.      Plaintiff Michael Harrington is a natural person who has standing to file this
lawsuit.

6.      Defendant The Art Institutes International LLC is a corporation incorporated and headquartered in Pennsylvania.  Defendant may be served with this lawsuit at 615 McMichael Rd, Pittsburgh, PA 15205 or at 210 6th Ave., 33rd Floor, Pittsburgh, PA 15222.

7.      Defendant employed Plaintiff within the confines of the Southern District of Texas, Houston Division.

8.      The Court has personal jurisdiction over Defendant based on general jurisdiction.

9.      The Court has subject matter jurisdiction over this case based on federal question jurisdiction under the False Claims Act.

## **FACTUAL BACKGROUND**

10.     Plaintiff was employed by Defendant as Director of Enrollment.

11.     Defendant's parent company entered into a consent decree with the United States Department of Justice to settle allegations of fraud related to Title IV of the Higher Education Act and parallel state statutes.  The case involved allegations of the company running a boiler room-style operation, in which admissions personnel were paid based purely on the number of students they enrolled, and engaging in deceptive and misleading recruiting practices.

12.     On August 14, 2019, Defendant's CEO, Elden Monday, and Houston Campus President, Byron Chung, informed Plaintiff that Defendant was drawing Title IV funds in the form of grants and loans from the United States federal government in the name of individuals not actually enrolled in the school.  Specifically, Defendant had submitted FAFSA applications on behalf of approximately 150 student applicants who had not formally enrolled in the school for the 2019-2020 academic year.  The purpose of the scheme was to receive funds from the federal government totaling approximately two million dollars—representing 585 course credits—for students who did not attend the school.

13.     Mr. Chung stated that he wanted Plaintiff, along with the Director of Financial Aid and the enrollment processor to contact the people on that list and convince them to fill out an enrollment agreement.  This would make it look like they were enrolled in the school and the government would not know it was being defrauded.

14.     Based on this information, Plaintiff initially believed that Defendant had committed a simple paperwork error and only needed these 150 students to fully execute their enrollment paperwork.  Mr. Chung sent Plaintiff a spreadsheet with the students' information and instructed Plaintiff to contact each of them to formally execute the enrollment agreement.  Mr. Chung informed Plaintiff that this would protect Defendant if the federal government audited the school.

15.     On August 14, 2019, Plaintiff began reaching out to the students on the spreadsheet. He spoke to two students.  Each of them reported that they had not enrolled with Defendant and that they neither authorized nor requested federal loans to be withdrawn in their names in order to be provided to Defendant.

16.     Plaintiff was surprised and initially unsure of how to inform Mr. Chung of what he had learned.  On August 21, 2019, Plaintiff met with Mr. Chung and informed him that he was concerned that the students on the spreadsheet did not intend to enroll in school with Defendant. Mr. Chung brushed off Plaintiff's concerns and told him that he was mistaken.  He told Plaintiff that it was a simple paperwork issue and that Plaintiff should continue to call the students on the list and make sure they signed their enrollment agreements.

17.     Plaintiff did not do so.  Instead, he continued to raise concerns to Mr. Chung that Defendant was seeking, receiving, and retaining federal Title IV funds for students who did not enroll in school during the 2019-2020 school year.  Mr. Chung disregarded Plaintiff's concerns and continued to order Plaintiff to call the students on the list.  Mr. Chung continued to falsely claim that the signed enrollment agreements were simply a formality to ensure that, if Defendant

-3-

were audited by the federal government, Defendant would be able to demonstrate that the students, for whom it had already received Title IV funds, were officially enrolled even though they never attended classes and had no idea federal funds had been withdrawn in their name.

18.     For students applying to most institutions of higher education, the process of submitting a FAFSA generally begins during the student's application process.  The FAFSA is generally due before the student learns which schools he or she has been accepted by.  Once the student is accepted and learns of his or her aid award for each school, the student logs onto the FAFSA application website and selects which institution should receive his or her student aid from the government.  The institution does not select itself through the FAFSA website; rather, a student makes that selection.

19.     Defendant, however, neither followed this process nor its own internal rules.  When a student visited Defendant to learn more about enrollment in a degree program, he or she met with a financial aid counselor of Defendant to discuss their options.  The financial aid counselor would ask the student to sign numerous agreements all at once, including a Master Promissory Note, Entrance Counseling document, and the FAFSA itself.  The counselors told the students that filling out all the commitment forms was simply a way for the student to understand what loans they would qualify for, but Defendant and its counselors knew this not to be true.

20.     Although the student was not committing to attend Defendant's Houston campus in their mind, Defendant had in fact induced the student to execute official loan requests that would direct federal funds into Defendant's accounts.  Defendant then used these signed forms to request and receive Title IV funds.  Some of these students eventually enrolled, but others never did. Regardless of their enrollment status, however, Defendant received and retained the Title IV funds from the federal government.   The students who never actually enrolled were put on the spreadsheet that Mr. Chung then provided to Plaintiff.

21.     Plaintiff observed other disturbing admissions irregularities.   The Consent Judgment that Defendant's parent company entered into with the United States Department of Justice required an online orientation prior to the student's first class, at no cost to the student.   The orientation program was required in order to address topics such as study skills, organization, financial literacy, and computer competency.   Critically, during the course of the orientation period, a student must be able to withdraw from enrollment without incurring any costs, and any grants or financial aid Defendant received on behalf of the student must be returned to the lender. However, Defendant routinely broke this rule.

22.     Plaintiff personally observed the Vice President of Enrollment, Matthew Madrid, regularly submit a ticket to the IT department stating that the student attempted to access the online orientation but had technical difficulties and could not complete it.   However, this was false and Defendant knew it to be false.   Defendant enrolled students who had never even attempted to access the online orientation.

23.     The Consent Judgment also contained strict agreements regarding refunds of Title IV funds and other financial aid amounts.   Defendant was required under the terms of the Consent Judgment to provide students with an enrollment agreement for their signature.   The enrollment agreement was further required to explain that students were entitled to a full refund if they withdrew within seven days of the first day of class at an in-person school or twenty-one days at an online school.   Students whose names were contained in the spreadsheet provided by Mr. Chung, however, never even signed an enrollment agreement and therefore had no knowledge of their right to a refund.   They did not even have knowledge that Title IV funds had been withdrawn and retained by Defendant in their names.

24.     On September 27, 2019, Mr. Chung asked Plaintiff what progress he had made on the list of individuals.   Plaintiff informed him that he had discontinued the phone calls after

learning of the fact of the students' non-enrollment with Defendant.  Plaintiff informed Mr. Chung that he would not take part in defrauding the federal government and that he would instead alert the government.  Mr. Chung became upset.

25.     On October, 2, 2019, Plaintiff was fired by Mr. Chung as soon as he walked into the office in the morning.  The same morning, Plaintiff sent an email to Defendant's leadership and HR calling this a *qui tam* case and informing them that his protected activity was the real reason he was fired.

26.     Incidentally, the reason offered to Plaintiff for his termination was that he accessed student information without authorization and communicated misleading information to students without authorization back on September 12, 2019.  This was false.  First, Plaintiff accessed student information and communicated with students on a daily basis as part of his job duties. Second, the alleged information he communicated to students was given to him by Mr. Chung to communicate.  On September 12, 2019, he sent an email, at Mr. Chung's express request, to former students who had previously attended a closed campus of Defendant to inform them that they could enroll at Defendant's Houston campus and receive a 50% tuition discount.  No explanation was provided as to why Plaintiff was not terminated immediately after September 12, 2019, and instead only after he engaged in protected activity under the False Claims Act.

27.     The real reason for Plaintiff's termination was his protected activity of reporting and attempting to mitigate Defendant's fraud on the federal government.

## FALSE CLAIMS ACT CLAIM OF RETALIATION

28.     Plaintiff incorporates the preceding paragraphs of this Complaint as if set forth verbatim.

29.     The False Claims Act "generally prohibits making false or fraudulent claims for payment of government funds or benefits."  *United States ex rel. Barrett et al. v. Columbia*

*Healthcare Corp.*, 2005 WL 1924187 at *12 (S.D. Tex.) (Aug. 10, 2005) (Rosenthal, J.) (citing *United States v. Hess*, 317 U.S. 537, 551 (1943)).

30.     The False Claims Act contains an anti-retaliation provision providing that an employee who "is discharged…or in any other manner discriminated against in the terms of employment because of lawful acts done by the employee…in furtherance of an action under this section or other efforts to stop 1 or more violations of this subchapter" "shall be entitled to all relief necessary to make that employee…whole."  31 U.S.C. § 3730(h)(1).

31.     The Act further provides that relief under the preceding paragraph "shall include reinstatement…, 2 times the amount of back pay, interest on the back pay, and compensation for any special damages sustained as a result of the discrimination, including litigation costs and reasonable attorneys' fees."  31 U.S.C. § 3730(h)(2).

32.     The elements of a retaliation claim are: "(1) the employee engaged in activity protected under the statute; (2) the employer knew that the employee engaged in protected activity; and (3) the employer discriminated against the employee because she engaged in protected activity."  *United States ex rel. George v. Boston Scientific Corp.*, 864 F. Supp. 2d, 597, 603-04 (S.D. Tex. 2012) (citing *United States ex rel. Graves v. ITT Educ. Servs., Inc.* 284 F. Supp. 2d 487, 510 (S.D. Tex. 2003)) (internal citations omitted).

33.     Section "3730(h) protects internal whistleblowers."  *See Robertson v. Bell Helicopter Textron, Inc.*, 32 F.3d 948, 951 (5th Cir. 1994) (internal citations omitted).  The employee does not need to file a *qui tam* action if they "express concerns about possible fraud to their employers."  *Id.; see also Clemes v. Del Norte Cty. Unified Sch. Dist.*, 843 F. Supp. 583, 595-96 (N.D. Cal. 1994); *United States ex rel. Kent v. Aiello*, 836 F. Supp. 720, 723-24 (E.D. Cal. 1993); *Neal v. Honeywell, Inc.*, 826 F. Supp. 266, 269-73 (N.D. Ill. 1993).

34. "The Fifth Circuit recognizes 'internal complaints that concern false or fraudulent claims for payment submitted to the government' as protected activity under the Act." *Melchior v. Apple Homecare Medical Supply, Inc.*, 2018 WL 1876287 at *3 (W.D. Tex.) (Jan. 8, 2018) (quoting *Diaz v. Kaplan Higher Educ., LLC*, 820 F.3d 172 (5th Cir. 2016)). "Courts consider the internal reporting of fraudulent activity to a supervisor to be a step in furtherance of uncovering fraud, and thus protected under the FCA." *Melchoir* at *3 (internal citation omitted).

35. In 2009, Congress amended the Act add relief for any employee discharged for acting "in furtherance of other efforts to stop [one] or more violations of this subchapter." *See Thomas v. ITT Educ. Servs., Inc.*, 517 Fed. Appx. 259, 262 (5th Cir. 2013). Protected activity under the Act is an activity "motivated by a concern regarding fraud against the government." *Id.* The [Act] "creates a cause of action for any person retaliated against by his employer for attempting to prevent an FCA violation." *Id.*

36. A *qui tam* action is not needed to bring a claim under the amended Section 3730(h). *Melchoir* at *3 (citing *Robertson*, 32 F.3d at 952). It is "contrary to the purpose of the whistleblower provision to leave an employee who was terminated for attempting to prevent fraud against the government without any remedy because the employee did not have the means, intention, or knowledge to pursue a *qui tam* suit." *Id.* at *4. Accordingly, it is not fatal to a whistleblower's claim that he has not pursued a *qui tam* suit. *Id.*

37. To engage in protected activity, an employee must simply "express concerns about possible fraud to their employers." *Columbia Healthcare Corp.*, 2005 WL 1924187 at *13 (internal citation omitted). "All that is required is that an employee be investigating false or fraudulent claims aimed at extracting money from the government." *Id.* (internal citation omitted). "The employee must, at least to some degree, couch [his] concerns or investigation in terms of funds [his] employer fraudulently obtained from the government." *Id.* (internal citation omitted).

38.     Plaintiff engaged in protected activity by reporting possible fraud prohibited by the Act to Defendant.  Defendant knew the employee engaged in protected activity because Plaintiff expressly told Defendant of the nature of the fraud and that it was unlawful and a *qui tam* case. Defendant terminated Plaintiff for engaging in protected activity and not for a legitimate reason. Accordingly, Plaintiff meets all the elements for a Section 3730(h) retaliation case.

## **JURY DEMAND**

39.     Plaintiff demands a jury trial.

## **DAMAGES AND PRAYER**

Plaintiff asks that he be awarded a judgment against Defendant for the following:

a.     Actual damages of twice the amount of lost back pay, lost benefits, and other economic losses;

b.     Reinstatement or front-pay;

c.     Compensatory damages;

d.     Punitive damages;

e.     Prejudgment and post-judgment interest;

f.     Court costs;

g.     Attorney's fees; and

h.     All other relief to which Plaintiff is justly entitled.

Respectfully submitted,


 /s/ Ahad Khan
Ahad Khan
Texas Bar No. 24092624
S.D. Texas ID No. 2981398
712 Main Street, Suite 900
Houston, TX 77002
(713) 401-3558 – Telephone
ak@ahadkhanlaw.com – Email

ATTORNEY FOR PLAINTIFF
MICHAEL HARRINGTON